Karl M. Tilleman (013435)
Melissa Posner (029953)
Jason M. Porter (027475)
STEPTOE & JOHNSON LLP
201 East Washington Street, Suite 1600
Phoenix, AZ  85004-2382
Telephone: 602.257.5200
Fax:  602.257.5299
ktilleman@steptoe.com
mposner@steptoe.com
jporter@steptoe.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| VTECH COMMUNICATIONS LTD., <br><br> Plaintiff, <br><br> vs. <br><br> MICROCHIP TECHNOLOGY INCORPORATED, a Delaware corporation; and MICROCHIP TECHNOLOGY IRELAND, <br><br> Defendants. | No. CV-14-02235-PHX-DLR <br><br> **SECOND AMENDED COMPLAINT** |

Plaintiff VTech Communications Ltd. ("VTech") alleges as follows for its Complaint against Defendants Microchip Technology Incorporated ("Microchip Inc.") and Microchip Technology Ireland ("Microchip Ireland") (collectively, "Microchip" or "Defendants"):

**Nature of the Action**

1. This lawsuit arises out of Defendants' sale of 60,735 defective PIC18F46J11T-I/ML microcontrollers (the "MCU Devices") to VTech.  VTech purchased and used the MCU Devices in pocket dosimeters (the "VTech Dosimeters") it sold to third-party medical and health customers.  When VTech became aware of the defective nature of the MCU Devices, it was forced to recall and rework the VTech Dosimeters at significant expense.

**Parties**

2. VTech designs, manufactures, and sells electronics products. VTech is organized under the laws of Hong Kong and has its principal place of business in Hong Kong.

3. Microchip Inc. develops, manufactures, markets, and sells certain specialized semiconductor products used by its customers in a wide variety of embedded control applications. Upon information and belief, Microchip Inc. has more than 7,000 employees and revenues in excess of $1.5 Billion. Microchip Inc. is incorporated under the laws of Delaware and has its principal place of business in Arizona. Microchip Inc. has a semiconductor wafer manufacturing plant, a product service center, and its corporate headquarters in Arizona.

4. Microchip Ireland is wholly-owned by Microchip Inc. and serves as Microchip Inc.'s sales/distribution agent for certain regions of the world. Microchip Ireland engages in significant business and financial dealings with Microchip Inc. in Arizona.

5. Microchip Ireland is incorporated under the laws of Ireland. Upon information and belief, Microchip Ireland's activities are principally directed, controlled, and coordinated in Arizona. Upon information and belief, Arizona is the principal place of business of Microchip Ireland.

6. Upon information and belief, Microchip Ireland operates as an agent of Microchip Inc., sells/distributes only Microchip Inc. products, and is subject to Microchip's Inc.'s direct control with respect to the sale/distribution of Microchip products. Specifically, upon information and belief, Microchip Inc. maintains guidelines for its sales/distribution agents (including Microchip Ireland) regarding the marketing, sale, and distribution of Microchip products. Moreover, Microchip Ireland has access to and relies upon Microchip Inc.'s corporate interfaces in Arizona, including Microchip Inc.'s corporate marketing and global sales departments.

7. Microchip Inc. holds out Microchip Ireland as its agent with respect to the sale/distribution of Microchip Inc. products. Specifically, Microchip Inc. holds out Microchip Ireland as *its* "Dublin, Ireland service center." Upon information and belief, Microchip Ireland directs inquiries regarding product inquiries, problems, or failures to Microchip Inc. in Arizona. Microchip Inc. conducts business on behalf of Microchip Ireland in Arizona, including by attempting to resolve the instant dispute with VTech.

8. Microchip Inc. owns (either directly or indirectly) 100% of the outstanding stock in Microchip Ireland. Defendants prepare and file consolidated financial statements with the United States Securities and Exchange Commission, which include the financials of Microchip Inc. and its subsidiaries (including Microchip Ireland).

9. Upon information and belief, Microchip Ireland and Microchip Inc. share common officers and directors. Specifically: (1) James Eric Bjornholt (who is based in Arizona) is a director for Microchip Ireland and the Vice President/CFO of Microchip Inc. and (2) Nawaz Sharif (who is based in England) is a director for Microchip Ireland and the Vice President, European Finance, of Microchip Inc.

10. Upon information and belief, Microchip Inc. is directly involved in the financing of Microchip Ireland, including by virtue of the distribution of Microchip Inc.'s products. Specifically, Microchip Inc. supplies its products to Microchip Ireland without requiring actual payment (*i.e.*, deferred revenues) for the products until the time of sale to the customer. In addition, Microchip Inc. gives credits to Microchip Ireland for certain products to allow Microchip Ireland to profit from the sale of the Microchip Inc. products.

11. Upon information and belief, Microchip Inc. hires and employs individuals who work on behalf of Microchip Ireland. Upon information and belief, Microchip Ireland has less than 15 employees. Upon information and belief, Microchip

1  Ireland participates in certain employee benefit options sponsored and offered by
2  Microchip Inc., including participating in Microchip Inc.'s stock option plan.

3      12.    Microchip Inc. and Microchip Ireland both use similar logos, trademarks,
4  and branding and make very little effort to distinguish the separate nature of the
5  companies when dealing with consumers. Both employees of Microchip Inc. and
6  Microchip Ireland correspond using email addresses that end with @microchip.com.
7  Moreover, Microchip Ireland does not maintain an internet presence separate from the
8  www.microchip.com website.

**Personal Jurisdiction**

10      13.    This Court has personal jurisdiction over Microchip Inc. because its
11  principal place of business is in Arizona. Microchip Inc. maintains substantial,
12  continuous, and systematic contacts with Arizona.

13      14.    The Court has personal jurisdiction over Microchip Ireland because, upon
14  information and belief, Microchip Ireland's principal place of business is in Arizona.
15  Microchip Ireland maintains substantial, continuous, and systematic contacts with
16  Arizona by virtue of its exclusive and extensive relationship and business dealings with
17  Microchip Inc. (in Arizona) and by virtue of Microchip Inc.'s control and coordination
18  of Microchip Ireland in Arizona.

19      15.    In addition, the Court has personal jurisdiction over Defendants because
20  VTech's claims arise from Defendants' contacts with Arizona. Upon information and
21  belief, the MCU Devices were designed by Microchip Inc. in Arizona. Upon
22  information and belief, sales and other promotional materials related to the MCU
23  Devices and relied upon by VTech were created in and disseminated by Defendants
24  from Arizona, including the "Microchip PIC18F46J11 Family Data Sheet." Upon
25  information and belief, components of the MCU Devices, including the semiconductor
26  wafers, were manufactured and inserted into the stream of commerce by Microchip Inc.
27  in Arizona. Upon information and belief, Microchip Ireland purposefully established

contacts with Microchip Inc. in Arizona as it pertains to the acquisition and sale of the defective MCU Devices to VTech.  Upon information and belief, Defendants' terms and conditions of sale originated in Arizona.  Finally, the defective MCU Devices were investigated and analyzed by Defendants in Arizona and Microchip Inc. (on behalf of itself and Microchip Ireland) attempted to resolve the dispute with VTech in Arizona.

16. In the alternative, Defendants consented to exclusive jurisdiction in the courts of the State of Arizona in connection with the sale of the defective MCU Devices to VTech.

**Subject Matter Jurisdiction and Venue**

17. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs and the action is between citizens of different states.

18. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

**General Allegations**

19. Microchip Inc. represents itself as the very best embedded control solutions company ever.  It claims that customers around the globe turn to it as the "world leader in the design and manufacture of microcontrollers," including the PIC® microcontrollers.  Microchip Inc. also holds itself out as a values-based company where quality comes first and customers are the company's focus.

20. During all times relevant to the allegations contained herein (including between December 2010 and December 2012), Defendants specifically represented to the public (including to VTech) on the Microchip website (which, upon information and belief, is maintained by Microchip Inc. in Arizona), in public corporate filings prepared in Arizona, and in other publications prepared in Arizona, that Microchip Inc. is the manufacturer of the PIC® microcontrollers sold to VTech.  For example: (1) Defendants represent in their "Quality Handbook" (which is available on the Microchip website) that Microchip Inc. focuses its "engineering, manufacturing and marketing resources"

- 5 -

1  on three product lines, including "microcontrollers," and that it has substantial
2  manufacturing operations; (2) Defendants represent on the Microchip website that
3  Microchip Inc. is the "world leader" in the "manufacture" of the PIC® microcontrollers;
4  and (3) Defendants represent in public 10-K filings between 2010 and 2012 that
5  Microchip Inc. and its subsidiaries "manufacture . . . specialized semiconductor
6  products," including "PIC® microcontrollers."

7      21.    In early 2009, based on Microchip's Inc.'s reputation for manufacturing
8  high-quality products, VTech informed Defendants' representative (Paul Mak) that it
9  needed a microcontroller for a product it was developing for sale to third parties (*i.e.*, the
10 VTech Dosimeter).  VTech corresponded with Mr. Mak by email to
11 paul.mak@microchip.com.  Mr. Mak held himself out as an authorized representative
12 and agent of Defendants and VTech understood and relied upon the same.  VTech
13 informed Mr. Mak of the necessary specifications of the microcontroller it needed,
14 specifically that it needed the microcontroller's timer function to work in asynchronous
15 mode.

16     22.    Mr. Mak recommended Microchip Inc.'s PIC18F46J11 microcontroller
17 for the application, stating in an email dated March 10, 2009, that the PIC18F46J11
18 microcontroller has two asynchronous counters and a high accuracy 32 KHz clock.  Mr.
19 Mak's email copied Jeffrey Ma, an associate regional distribution manager for
20 Microchip Inc.

21     23.    In addition to Mr. Mak's representations, Defendants' also had published
22 sales material for PIC18F46J11 microcontrollers, including the "Microchip
23 PIC18F46J11 Family Data Sheet," available to the public on the www.microchip.com
24 website, which further represented that the PIC18F46J11 microcontroller could be used
25 in asynchronous counter mode in conjunction with the microcontroller's timer module.
26 The "Microchip PIC18F46J11 Family Data Sheet" specifically represented that
27 "Microchip products meet the specifications contained in their particular Data Sheet."

28

1  24. Based on all of these representations, VTech entered into a series of purchase contracts with Defendants between December 2010 and December 2012. In all, VTech purchased 60,735 MCU Devices from Defendants.

25. Each of the purchase contracts was initiated by a purchase order provided to Defendants by VTech. Per instructions provided by a representative of Defendants, VTech delivered the purchase orders to a Hong Kong address for Microchip Ireland (a previously unknown entity). Despite having been instructed to direct the purchase orders to Microchip Ireland, both Microchip Inc. and Microchip Ireland were parties to the purchase contracts. VTech was never informed by Defendants or any other Microchip representative that Microchip Inc. would not be a party to the purchase contracts.

26. Each of the purchase orders provided by VTech specifically and unambiguously stated that Defendants' furnishing of the requested microcontrollers "shall constitute acceptance by [Defendants]" of VTech's purchase order and will be subject to VTech's stated terms and conditions. VTech *expressly* informed Defendants that "[m]odifications [of its terms and conditions] or additions [thereto] to be effective *must* be made in writing and be signed by [VTech]." That is, VTech expressly conditioned its contracts with Defendants upon Defendants agreeing to VTech's stated terms and conditions.

27. Pursuant to the representations made by Defendants and Defendants' representatives, each of VTech's purchase orders explicitly stated that "Seller warrants that all materials, goods and services ordered or rendered hereunder will conform in all respects with the specifications, drawings samples or other description furnished or specified by [VTech] and will be merchantable and free from any defects in material and workmanship and Seller further warrants that all materials and goods purchased hereunder that are manufactured in accordance with Seller's specifications shall be fit and sufficient for the purposes of which it was designed. Seller agrees that the

- 7 -

foregoing warranty shall subsist notwithstanding Buyer's acceptance of and payment for the materials and goods ordered or rendered."

28. Based on representations made by Defendants, each of the purchase orders specifically stated that the MCU Devices would be manufactured by Microchip Inc. VTech fully expected that Microchip Inc. would be the entity manufacturing the MCU Devices and expected high-quality products as a result.

29. Defendants at all relevant times understood that VTech was relying upon the representations made by Defendants and Defendants' representatives regarding the MCU Devices and knew that VTech intended to integrate the MCU Devices into the VTech Dosimeters. Defendants knew at all relevant times that a sale of defective MCU Devices would cause significant damages to VTech.

30. After VTech provided the conditional purchase orders to Defendants, VTech received order acknowledgments from Defendants on "Microchip" letterhead. The order acknowledgements specifically referred VTech to "Microchip" for any questions, directed VTech to the Microchip webpage (www.microchip.com) for further information, and specifically confirmed that "Microchip's products, for the most part, involve hardware integrated circuit devices manufactured by Microchip."

31. The order acknowledgements did not state that Microchip Inc. was not a party to the purchase contracts. To the contrary, the order acknowledgements specifically confirmed that Microchip Inc. was a party to the contracts. The order acknowledgements specifically stated that "Microchip Technology Inc. or Microchip Technology Ireland Limited, as applicable, and its subsidiaries, ('Microchip'), offers for sale to you ('Customer') the goods and services specified in Microchips Order Acknowledgment ('Acknowledgment') or otherwise delivered to Customer ('Goods' or with regard to fee-based services, 'Services')."

32. Despite VTech's express requirement that Defendants accept the VTech terms and conditions stated in the purchase offers, Defendants' order acknowledgements

were accompanied by a set of Defendants' own terms and conditions of sale (which originated in Arizona). Although Defendants' terms and conditions included certain terms to which VTech had no objection (including a choice of law and venue clause, whereby ***Defendants*** demanded that Arizona law would apply and selected Arizona as the venue for the parties' disputes), Defendants' terms and conditions included certain terms that were directly and materially contrary to terms that VTech unambiguously stated would require written approval to modify. For example, despite Defendants' representations regarding the suitability, fitness, and merchantability of the MCU Devices, Defendants sought to disclaim any warranties of merchantability and fitness and limit their prospective liability.

33. Despite representing to consumers that Defendants maintain a contract review process to ensure that contract requirements are adequately documented and "[a]ny differences between customer requirements and Microchip's capabilities are identified and resolved," Defendants ***at no time*** asked VTech to consent to its inconsistent terms and conditions in writing and ***at no time*** attempted to discuss or resolve the inconsistent terms with VTech.

34. VTech did not consent to Defendants' contrary terms and conditions in writing or otherwise.

35. With full knowledge of the conditional nature of VTech's purchase orders, Defendants supplied VTech with 60,735 MCU Devices. VTech remitted the agreed-upon purchase price to Defendants with the express understanding that it had not consented to Defendants' contrary terms and conditions.

36. Between February 2011 and March 2013, VTech incorporated 46,235 of the MCU Devices into the VTech Dosimeters, which were subsequently sold to third parties.

37. On or around April 16, 2013, VTech became aware that the MCU Devices in the VTech Dosimeters did not work properly or reliably. VTech notified Defendants' representatives of the problems no later than April 16, 2013.

38. On or around June 17, 2013, VTech sent Defendants' representatives samples of the MCU Devices for failure analysis.

39. Engineers acting on behalf of Defendants inspected the VTech Dosimeters and investigated the malfunctioning of the MCU Devices. Microchip Inc. (in Arizona) was directly involved in investigating the malfunctioning of the MCU Devices.

40. On or around November 8, 2013, Defendants publically announced (from Arizona) that the timer function on the MCU Devices was defective when used in asynchronous mode, by posting Silicon Errata and Data Sheet Clarification No. DS800000435K on the www.microchip.com website.

41. On December 2, 2013, VTech again alerted Microchip Inc. about the faulty operations of the MCU Devices and informed Microchip Inc. that third-party purchasers of the VTech Dosimeters would be recalling the units. Microchip Inc. did not refer VTech to any other entity to seek resolution of its claims.

42. Instead, in April 2014, representatives of Microchip Inc. in Arizona (Greg Robinson, Microchip Inc.'s Marketing Director for MCU8; and Vivien Delport, Microchip Inc.'s Director of Applications Engineering) and representatives of VTech discussed the defective MCU Devices and the steps Microchip Inc. would take to address the issue. On April 16, Mr. Robinson informed VTech that he would review the situation with the "MCU8 management team."

43. Microchip Inc. continued to investigate the defective MCU Devices and directly contacted VTech (from Arizona) to attempt to resolve – for itself and its agents and subsidiaries – all issues arising from the defective MCU Devices.

44. As a result of the defective MCU Devices, VTech has had to recall and rework the VTech Dosimeters it sold containing the defective MCU Devices at significant expense and harm to its reputation.

**Count I: Breach of Warranty of Merchantability**

45. VTech incorporates by reference paragraphs 1 through 44 of its Second Amended Complaint, as though fully stated herein.

46. VTech contracted with Defendants for the purchase of the 60,735 MCU Devices.

47. Defendants expressly and impliedly warranted that the MCU Devices sold to VTech were fit for their ordinary purpose and complied with design specifications contained in Defendants' sales materials, including but not limited to the "Microchip PIC18F46J11 Family Data Sheet."

48. The MCU Devices were not fit for the ordinary purpose for which such goods are used.

49. The MCU Devices did not conform to the design specifications provided in Defendants' sales materials associated with the MCU Devices, including but not limited to the "Microchip PIC18F46J11 Family Data Sheet."

50. As a result of the defects in the MCU Devices, VTech has incurred (and continues to incur) significant damages, including, but not limited to: monetary expenses associated with recalling and reworking VTech's products containing the MCU Devices; liability to third parties who purchased the VTech products containing the defective MCU Devices; lost profits; damage to reputation; interest; and other damages.

**Count II: Breach of Warranty of Fitness**

51. VTech incorporates by reference paragraphs 1 through 50 of its Second Amended Complaint, as though set forth fully herein.

52. At the time VTech purchased the MCU Devices, VTech intended to incorporate the MCU Devices into VTech Dosimeters for sale to its customers.

53. Defendants knew and had reason to know of VTech's intention to incorporate the MCU Devices into its products and of VTech's requirements for use of the MCU Devices, including the need for the MCU Devices to properly function in asynchronous counter mode.

54. Defendants and representatives of Defendants specifically recommended the MCU Devices to VTech as suitable for VTech's intended use.

55. VTech relied on Defendants' experience, skill, and judgment in purchasing the MCU Devices for use in the VTech Dosimeters.

56. Defendants were aware that VTech relied on its experience, skill and judgment in purchasing the MCU Devices for use in the VTech Dosimeters.

57. Defendants expressly and impliedly warranted that the MCU Devices were fit for their intended purpose.

58. The MCU Devices were not fit for their intended purpose and Defendants have acknowledged that the MCU Devices were defective.

59. As a result of defects in the MCU Devices, VTech has incurred (and continues to incur) significant damages, including, but not limited to: monetary expenses associated with recalling and reworking VTech's products containing the MCU Devices; liability to third parties who purchased the VTech products containing the defective MCU Devices; lost profits; damage to reputation; interest; and other damages.

**Count III:  Breach of Contract**

60. VTech incorporates by reference paragraphs 1 to 59 of its Second Amended Complaint, as if set forth fully herein.

61. VTech contracted with Defendants for the purchase of 60,735 MCU Devices.

- 12 -

62. VTech complied with all terms and conditions of the contracts with Defendants.

63. Defendants breached the parties' contracts by failing to supply non-defective MCU Devices to VTech.

64. As a result of Defendants breaches of contract, VTech has incurred (and continues to incur) significant damages, including, but not limited to: monetary expenses associated with recalling and reworking VTech's products containing the MCU Devices; liability to third parties who purchased the VTech products containing the defective MCU Devices; lost profits; damage to reputation; interest; and other damages.

**Agency/Alter-Ego**

65. VTech incorporates by reference paragraphs 1 to 64 of its Second Amended Complaint, as if set forth fully herein.

66. In the alternative, to the extent the purchase contracts were between VTech and Microchip Ireland only, Microchip Inc. is nevertheless liable for Counts I-III pleaded herein because Microchip Ireland was acting as an agent of Microchip Inc. and/or is the alter ego of Microchip Inc.

67. Upon information and belief, Defendants at all relevant times were the agents, servants, employees, principals, joint venturers, alter ego, and/or partners of each other. Upon information and belief, in doing the things alleged in this Second Amended Complaint, Microchip Ireland was acting within the scope of authority conferred upon it by the consent, approval, and/or ratification of Microchip Inc., whether said authority was actual or apparent.

68. Microchip Ireland should not be treated as a separate entity from Microchip Inc. because Microchip Inc. controls Microchip Ireland to such a degree as to render the latter the mere instrumentality of the former. Further, to not disregard Defendants' purported separate identities would result in fraud or injustice on VTech to

- 13 -

the extent VTech is required to pursue parallel litigation against Microchip Ireland in a foreign country, especially when Defendants demand that all litigation be brought in Arizona and especially when Defendants make little effort to differentiate between various Microchip entities in marketing and selling products to consumers.

**WHEREFORE**, VTech respectfully requests that this Court:

1. Enter judgment against Defendants, jointly and severally, for VTech's damages, including consequential and incidental damages to the maximum extent permitted by law, in an amount to be determined at trial;

2. Award VTech its attorneys' fees and costs, pursuant to Arizona Revised Statute 12-341.01 or other applicable law; and

3. Award such other relief as the Court may deem just and proper under any applicable law.

DATED this 5th day of May 2015.

STEPTOE & JOHNSON LLP

By   s/Karl M. Tilleman
     Karl M. Tilleman
     Melissa E. Posner
     Jason M. Porter
     201 East Washington Street, Suite 1600
     Phoenix, Arizona 85004-2382

*Attorneys for Plaintiff VTech Communications Ltd.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on counsel of record this 5th day of May, 2015 through the Court's CM/ECF system.

s/Beth E. Gibson<br>Beth E. Gibson